UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


ANTONIO RUIZ,                     :
        Plaintiff,               :
                                  :
    v.                            :    Case No. 3:10-CV-1506(AWT)
                                  :
DR. MARK FRAYNE, ET AL.           :
        Defendants.               :


## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

The plaintiff Antonio Ruiz, currently incarcerated at Garner Correctional Institution in Newtown, Connecticut, commenced this civil rights action *pro se* and *in forma pauperis* against Drs. Mark A. Frayne, Edward Blanchette, Carson Wright, Gerard Gagne, Jr. and Robert Berger.  The plaintiff alleges that the defendants subjected him to unconstitutional conditions of confinement when they placed him on a liquid diet and deprived him of solid food for a thirteen-day period in 2008 and a ten-day period in 2009. The defendants have moved for summary judgment.  For the reasons that follow, the motion for summary judgment is being denied.

## I.   Legal Standard

A motion for summary judgment may not be granted unless the court determines that there are no genuine issues of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Gallo v. Prudential Residential Servs.*, 22

F.3d 1219, 1223 (2d Cir. 1994).  The moving party bears the
burden of demonstrating "the absence of a genuine issue of
material fact."  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157
(1970).

When deciding a motion for summary judgment, the court is
required to "construe all the evidence in the light most
favorable to the nonmoving party . . . and [to] draw all
inferences and resolve all ambiguities in that party's favor."
*Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d
Cir. 2008).  Nonetheless, the inferences drawn in favor of the
nonmovant must be supported by evidence.  *See Western World Ins.
Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (when
summary judgment motion is supported by documentary evidence and
sworn affidavits, the nonmoving party must do more than vaguely
assert "the existence of some unspecified disputed material
facts" or rely on "mere speculation or conjecture" as to the true
nature of the facts) (internal quotation marks and citations
omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252
(1986) ("mere existence of a scintilla of evidence in support of
the [nonmovant's] position will be insufficient; there must be
evidence on which [a] jury could reasonably find for the
[nonmovant]").

The court may not try issues of fact when ruling on a motion
for summary judgment, but must leave those issues to the jury.
*See, e.g.*, *Anderson*, 477 U.S. at 255; *Donahue v. Windsor Locks*

2

*Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987).  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." *Gallo*, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact.  Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law." *Id.*  Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  Immaterial or minor facts are insufficient to defeat a motion for summary judgment. *See Howard v. Gleason Corp.,* 901 F.2d 1154, 1157 (2d Cir. 1990).

Where one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  Despite this liberal interpretation, however, an unsupported assertion cannot overcome

3

a properly supported motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## II.  Facts[1]

The plaintiff was born in 1986 and has been incarcerated at Northern Correctional Institution ("Northern") at various times since January 2007.  In July 2008, a Department of Social Services Social Worker diagnosed the plaintiff as suffering from Attention Deficit and Hyperactivity Disorder, a Mood Disorder, an Impulse Control Disorder and learning disabilities.  On September 18, 2008, a judge in Connecticut Superior Court for the Judicial District of Hartford sentenced the plaintiff to  nineteen years and twelve months of imprisonment.

Dr. Mark Frayne ("Frayne") is a Supervising Psychologist who is employed by the University of Connecticut Health Center ("UCONN"), which contracts to provide inmates within the Department of Correction with medical and mental health care through an entity known as Correctional Managed Health Care ("CMHC").  He has participated in the treatment of the plaintiff during his confinement at Northern.

Dr. Robert Berger ("Berger") is the statewide Director of Mental Health and Psychiatric Services for CMHC.  Drs. Carson

---

[1] The facts are taken from defendant's Local Rule 56(a)(1) Statement [Doc. No. 27-6], defendants' Affidavits and attached exhibits [Doc. No. 27-2 through 27-5], plaintiff's Local Rule 56(a)(2) Statement [Doc. No. 32-1] and plaintiff's Affidavit and attached exhibits [Doc. No. 32-2] and the Affidavit of Jennifer Traverse [Doc. No. 27-3].

Wright ("Wright") and Gerard Gagne ("Gagne") are physicians who work for the Department of Correction and CMHC, and were employed at Northern during 2008 and 2009.  Dr. Edward Blanchette ("Blanchette") was the Department of Correction's Director of Clinical Services during 2008 and 2009.

During his incarceration at Northern, the plaintiff has exhibited self-destructive behavior including attempts to harm himself by inserting foreign objects into his penis and putting fabric around his neck.  Mental health professionals within the Department of Correction have provided the plaintiff with intensive mental health treatment.

Psychotropic medication has had a minimal effect on the plaintiff's behaviors.  The plaintiff has pleaded guilty to three disciplinary reports accusing him of assaulting correctional staff.  Mental health professionals have worked with custody staff at Northern to address the plaintiff's behavior.

On January 1, 2008, the plaintiff swallowed approximately twenty Depakote tablets.  He also threatened to insert something into his penis.  During an assessment by mental health staff, the plaintiff stated that he wanted to hurt himself in such a way that he would die.  Blanchette placed the plaintiff on suicide watch, provided him with a special mattress to use and a gown to wear and ordered that the plaintiff only receive finger foods and eat in the presence of a nurse.  During an evaluation following the suicide attempt, a mental health professional noted that the

plaintiff had been diagnosed as suffering from Antisocial Personality Disorder.

From January 2, 2008 to May 23, 2008 and from September 17, 2008 to October 9, 2008, the plaintiff engaged in various types of self-injurious behavior, including inserting part of his gown and pieces of cement, cardboard, toilet paper, a Styrofoam cup, pens and a milk carton into his penis; hitting his head on the cell wall causing it to bleed; banging his handcuffs causing his wrists to swell; and tying things around his neck. He also attempted to destroy or deface prison property during this time period. He urinated outside his cell, ripped his prison gown and blanket, broke a window in his cell with the tether chain from in-cell restraints, smeared feces on cell walls, threw food, flooded his cell and attempted to destroy the toilet in his cell.

Northern correctional staff, as well as medical and mental health staff, including the defendants, used various methods to gain control of the plaintiff and prevent him from self-harm during these time periods. They placed the plaintiff on suicide watch, one-on-one observation or behavior modification status, administered chemical agents, applied in-cell and four-point restraints, restricted him to a special gown and mattress, prescribed medications in liquid form, involuntarily medicated him and placed him on a diet restricted to finger foods.

From July 2, 2008 until September 2, 2008, the plaintiff was confined at Whiting Forensic Division of the Connecticut Valley

6

Hospital, which is a hospital under the administration of the Department of Mental Health and Addiction Services.  The plaintiff received three meals a day at Whiting.

On October 9, 2008, at Northern, the plaintiff reported that he had placed part of a milk carton in his penis.  The mental health staff placed the plaintiff on suicide watch in the medical unit, provided him with a special gown to wear and ordered that he only receive and eat finger foods while in the presence of a nurse.

On October 10, 2008, Ducate, Frayne, Blanchette and Wright met to discuss the plaintiff's self-destructive behavior.  The group decided to place the plaintiff on a liquid diet for seven days.  The diet consisted of milk, juice, broth, water and jello. The liquid diet was an attempt to communicate to the plaintiff that if he did not stop attempting to harm himself by inserting things into his penis, he would suffer grave harm, including death.  In addition, through the imposition of the liquid diet, the mental health staff at Northern were committed to motivating the plaintiff to make safe decisions for himself.  The decision to subject the plaintiff to the liquid diet was made because other mechanisms to modify the plaintiff's behavior had failed. The diet was not meant to harm or punish the plaintiff.  Instead, it was designed to deter the plaintiff's self-injurious behavior.

The plaintiff initially refused to discuss the reasons that he was inserting items into his penis, but eventually did so

7

after the diet was extended another seven days.  The plaintiff
occasionally refused broth, milk and orange juice at different
times while on the liquid diet.  The plaintiff was confined in
the medical unit during the time period that he was receiving the
liquid diet.

On October 22, 2008, Blanchette and other mental health
staff discussed the improvement in the plaintiff's behavior and
agreed to take him off the liquid diet and place him on a finger
food diet.  Blanchette directed the mental health staff to inform
the plaintiff that if he attempted to insert items into his penis
again, the liquid diet would be re-imposed for an even longer
time period and that he needed to engage in interactions with
medical staff in order to regain lost privileges.

On October 23, 2008, the plaintiff met with Frayne and asked
for a radio and a single cell.  Frayne felt the plaintiff should
remain on finger foods for a longer period of time in order to
increase his motivation to return to a regular housing unit.

On October 30, 2008, the plaintiff inserted a parts of milk
carton and orange juice carton and a piece of paper into his
penis.  The plaintiff remained on a finger food diet for seven
more days and then Blanchette ordered that the plaintiff receive
a regular diet.

On December 24, 2008, the plaintiff reported discharge
coming from his penis, but denied inserting anything into it.  On
December 26, 2008, the plaintiff tied sheet strips loosely around

8

his neck.  Mental Health staff placed the plaintiff on suicide
watch.

In late January 2009, the plaintiff began to insert objects
into his penis again.  Medical staff placed him on an antibiotic
and monitored him.  On January 27, 2009, Blanchette again ordered
that the plaintiff be placed on the liquid diet for seven days to
deter his repeated and extremely self-destructive behavior.  The
liquid diet was extended an additional seven days. On February 5,
2009, the plaintiff was taken off the liquid diet and put on a
finger food diet.  Later that day, the plaintiff placed two
objects in his penis and had to be sent to UCONN for evaluation.
A urologist at UCONN removed two foreign objects from the
plaintiff's penis and Department of Correction personnel
transported the plaintiff back to Northern.  Mental Health staff
admitted the plaintiff to the infirmary and placed him on a
finger food diet.

On February 21, 2009, a correctional officer found the
plaintiff with something around his neck.  Medical staff
transferred the plaintiff to a cell in the infirmary, applied in-
cell restraints and placed him on suicide watch.  Later that day,
the plaintiff told custody staff that he had inserted part of a
cup into his penis.  Blanchette, Wright and Gagne issued an order
that the plaintiff be restricted to a liquid diet.

Frayne met with the plaintiff on February 23, 2009 and noted
that the plaintiff said he had lied about the insertion behavior.

9

Frayne discontinued the order for the liquid diet because the
plaintiff had not inserted anything into his penis. Frayne
entered a new order that the plaintiff be placed on finger food
and tap water.

The defendants consider the plaintiff to be a mental health
patient whose self-injurious behavior is particularly troubling.
The plaintiff exhibited complicated behavioral and mental health
issues which were very challenging to treat.

## III. Discussion

The defendants move for summary judgment on two grounds.
They argue that: (1) the plaintiff fails to allege that they
subjected him to unconstitutional conditions of confinement when
they placed him a liquid diet in 2008 and 2009, and (2) they are
shielded from liability by qualified immunity.

### A.   Conditions of Confinement

The plaintiff claims that the defendants subjected him to
cruel and unusual punishment in violation of the Eighth Amendment
when they deprived him of solid food for a thirteen-day period in
2008 and a ten-day period in 2009.  The defendants contend that
they did not impose unconstitutional conditions of confinement on
the plaintiff because they were not deliberately indifferent to
the plaintiff's health or safety. *See Trammell v. Keane*, 338 F.3d
155, 162-63 (2d Cir. 2003) (adopting "deliberate indifference" as
the scienter standard in challenges to prison conditions under
the Eighth Amendment).

10

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993.  The Eighth Amendment imposes duties on prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citation omitted).  An inmate may prevail on an Eighth Amendment claim if he can establish objective and subjective elements.  *See Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002).

The objective element is satisfied where the inmate shows that the condition or conditions caused "serious deprivations of basic human needs" or deprived him "of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  The Supreme Court has defined human needs to include food, medical care, sanitation, clothing, habitable shelter, safety, warmth and exercise.  *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991); *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 200 (1989); *Rhodes*, 452 U.S. at 347-48. "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient" to state a claim of unconstitutional conditions of confinement. *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing

11

*Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).  An important
consideration in determining whether a particular condition
deprived an inmate of a basic human need or life necessity is the
duration of the condition.  *See Hutto v. Finney*, 437 U.S. 678,
687 (1978) (conditions may "be tolerable for a few days and
intolerably cruel for weeks or months"); *Wright v. McMann*, 387
F.2d 519, 526 (2d Cir. 1967) ("civilized standards of humane
decency . . . do not permit" an inmate to be placed in a filthy,
unheated strip cell and deprived of clothes and basic hygiene
items such as soap and toilet paper for a substantial period of
time (thirty-three days)).

The defendants do not specifically address the objective
element of the Eighth Amendment standard.  The Second Circuit has
recognized that the Eighth Amendment requires that prisoners be
provided with "nutritionally adequate food that is prepared and
served under conditions which do not present an immediate danger
to the health and well being of the inmates who consume it."
*Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (citation
omitted).  The plaintiff has alleged that the defendants placed
him on a liquid diet for a thirteen-day period and a ten-day
period.  During these time periods, prison staff offered the
plaintiff three chicken broths, two small cartons of orange juice
and two small cartons of milk.  The defendants aver that the
plaintiff did not always consume the liquids offered to him.

The plaintiff has submitted an affidavit of a registered

nurse who calculated the daily caloric content of the three types
of liquids received by the plaintiff.  The nurse determined that
if the milk offered the plaintiff was whole milk, the total daily
caloric content of the milk, juice and broth would be 1,605.  If
the milk were 1% milk, the total daily caloric content of the
milk, juice and broth would be 1,326.  *See* Travers. Aff. at ¶¶
12-20.  The only evidence provided by the defendants as to the
nutritional adequacy of the liquid diet offered to the plaintiff
is contained in the Affidavit of Dr. Mark Buchanan ("Buchanan").
He avers that a diet of milk, juice and water provides water,
carbohydrates, selected vitamins and minerals, fat and protein.
Buchanan opines that placing a person on such a diet for only a
few weeks might lead to constipation and possibly moderate weight
loss, but would not cause serious or lasting adverse health
effects.  Buchanan Aff. ¶¶ 15-16.

The defendants provided no information regarding the caloric
content of the liquid diet items offered to the plaintiff or
whether he suffered any weight loss during the time that he was
on the diet.  The plaintiff avers that he was not medically
monitored and was not weighed during the time periods he was
placed on the liquid diet.  The court concludes that the
defendants have not met their burden of establishing that there
is no genuine issue of material fact as to whether they offered
the plaintiff a nutritionally adequate diet that was served under
conditions which did not present an immediate danger to the

health and well-being of the plaintiff.  Thus, the defendants
have not shown they are entitled to judgment as a matter of law
as to the objective element of the Eighth Amendment conditions
standard.

The subjective element requires the inmate to show that
correctional officials were aware of and disregarded a
substantial risk of serious harm.  *Phelps*, 308 F.3d at 185-86.
To violate an inmate's Eighth Amendment right to humane
conditions, defendants "must both be aware of facts from which
the inference could be drawn that a substantial risk of serious
harm exists, and ... must also draw that inference." *Farmer v.
Brennan*, 511 U.S. 825, 837 (1994).

With regard to the subjective element of the Eighth
Amendment standard, the defendants rely on the Second Circuit's
decision in *Trammell*, 338 F.3d 155.  In *Trammell*, prison
officials imposed several deprivation orders upon the plaintiff
in response to his behavior that had resulted in sixteen
disciplinary reports over a five week period.  Prison officials
deprived Trammell of a mattress and bedding for fourteen days,
clothing except a pair of undershorts, and toiletries for
seventeen days and gave him an inadequate supply of toilet paper
for about one week.  In addition, another deprivation order
extended the duration of a prior order that restricted Trammell's
diet to "'nutriloaf' (a bread-like food containing carrots and
potatoes) and raw cabbage." *Id.* at 158.

14

In addressing the deliberate indifference element of the Eighth Amendment conditions standard, the Second Circuit considered the deprivation orders to be disciplinary measures that implicated institutional concerns for preserving internal order, safety and discipline.[2]  Thus, it concluded that the issue was:

> not simply whether the . . . [deprivation] Order was imposed with deliberate indifference to Trammell's health and safety, for it is indisputable that the Order was intended to make Trammell uncomfortable in an effort to alter his behavior.  Rather we consider whether the Order was reasonably calculated to restore prison discipline and security, and in that purposive context, whether the officials were deliberately indifferent to Trammell's health and safety.

*Id.* at 163.

The Second Circuit found that the orders were harsh but were also "reasonably calculated to correct Trammell's outrageous behavior" because the orders provided for rewards to be earned by Trammell, in the form of the restoration of privileges, for positive adjustments to his behavior.  *Id.*  In addition, the imposition of the deprivation orders did not constitute deliberate or intentional indifference to Trammell's basic health or safety because "a nurse regularly observed Trammell to ensure

---

[2]  In *Trammel*, the Second Circuit found it unnecessary to consider the objective prong of the Eighth Amendment standard because it concluded that there were no issues of material fact in dispute regarding the subjective prong of the standard and, therefore, affirmed the district court's decision to grant the defendants' motion for summary judgment.  *See id.* at 162.

that his health was not jeopardized during the deprivation period." *Id.* at 164.  The Second Circuit concluded that the disciplinary measures implemented by prison officials against Trammell "directly and proportionally targeted [his] misconduct." *Id.* at 166.

The plaintiff argues that the defendants' reliance on *Trammell* is misplaced.  The court agrees.

The defendants contend that the placement of the plaintiff on a liquid diet was not intended to be punishment but rather was intended to deter his self-injurious behavior after other attempts at behavioral modification had been unsuccessful.  Thus, the defendants are not arguing that the liquid diet was imposed as a disciplinary measure.  In *Trammell*, the deprivation orders were imposed in response to the issuance of disciplinary reports and the Second Circuit specifically referred to the deprivation orders as disciplinary measures.  Thus, the deliberate indifference standard adopted by the Second Circuit in *Trammell,* pursuant to which it considered whether the deprivation orders were reasonably calculated to restore prison discipline and security, does not appear to be applicable to the facts of the present case.

The plaintiff contends that the defendants were deliberately indifferent to his basic human need for food because the liquid diet was not reasonably calculated to deter his repeated attempts to harm himself.  In cases considering claims of prison

16

officials' attempts to modify an inmate's behavior using non-punitive measures, the courts consider the relationship between the behavior and the modification method being employed as well as the efforts undertaken by prison staff or medical or mental health professionals to monitor the inmate's health and safety during the time period the deprivations/restricted conditions remain in effect. *See Bowers v. Pollard*, 345 F. App'x 191, 196-97(7th Cir. 2009) ("restrictions imposed on Bowers were non-punitive and designed instead to prevent him from harming himself and others, and the terms of the plan were reevaluated on a regular basis"); *Gay v. Chandra*, 652 F. Supp. 2d 959, 972 (S.D. Ill. 2009) ("Given that Gay had never attempted to harm himself with his clothes before, the Court finds that there is a genuine issue of material fact as to whether Dr. Chandra violated Gay's Eighth Amendment rights by requiring that he be restrained without clothes."); *Jiles v. Breen-Smith*, 2009 WL 4827065, *2 (W.D. Wis. Dec. 8, 2009) (finding that deprivations - including no mattress or blanket, a paper gown, provision of only one food item at a time - imposed by prison officials were intended to prevent the plaintiff from self-harm, and that officials showed appropriate concern for plaintiff's health and safety by providing plaintiff with multiple visits from psychological staff and medical staff during the two-week time period the plaintiff was subject to the deprivations).

    The parties agree that the plaintiff has attempted to harm

17

himself by inserting objects into his penis, banging his head or choking or hanging himself. *See* Frayne Aff. ¶¶ 13, 102; Ruiz Aff. ¶¶ 8, 32.  The defendants, who are medical and mental health professionals, imposed the liquid diet in an effort to deter the plaintiff from self-injurious behavior. *See* Frayne Aff. ¶¶ 128, 134.  The plaintiff, however, avers that he has never attempted to insert food into his penis or any other body part other than his mouth. *See* Ruiz Aff. ¶ 11.  Furthermore, the parties dispute whether the medical staff made any efforts to monitor the plaintiff's health during the time periods when he was receiving the liquid diet. *See* Frayne Aff. ¶ 133; Travers Aff. ¶¶ 7-9. The court concludes that there are genuine issues of material fact as to whether the defendants were deliberately indifferent to the plaintiff's health or safety when they restricted the plaintiff to a liquid diet in an effort to stop him from harming himself.

Therefore, the motion for summary judgment on this ground is being denied.

**B.   Qualified Immunity**

In addition to arguing that their actions did not violate the plaintiff's Eighth Amendment rights, the defendants contend that they are entitled to qualified immunity on the plaintiff's claims. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or

18

constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The defendants have not sufficiently addressed the issues relating to qualified immunity.  In the Second Circuit,

> [o]ur analysis of a qualified immunity claim consists
> of a three step inquiry. First, we must determine
> whether plaintiff has alleged a violation of a
> constitutional right. Then we consider if the violated
> right was clearly established at the time of the
> conduct. Finally, if plaintiff had a clearly
> established, constitutionally protected right that was
> violated by the actions of the Board, he or she must
> demonstrate that defendants' actions were not
> objectively reasonable. This three step inquiry should
> typically be done in sequential order.

*Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211 (2d Cir. 2003) (internal citations omitted). The defendants' cursory treatment of qualified immunity fails to articulate why the "little law that exists" regarding the conduct at issue here does not implicate a clearly established right. Thus, they have not met their burden of demonstrating that they are entitled to qualified immunity.

Therefore, the motion for summary judgment is being denied on this ground.

## IV.  Conclusion

The defendants' motion for summary judgment (Doc. No. 27) is hereby DENIED.

It is so ordered.

19

Dated this 24th day of September, 2012, at Hartford, Connecticut.

_____/s/AWT_____
Alvin W. Thompson
United States District Judge
